**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 05-21182-CIV-TORRES

CONSENT CASE

TRIPLECHECK, INC.,
d/b/a SEA TOW MIAMI,

    Plaintiff,

vs.

CREOLE YACHT CHARTERS LIMITED,
in personam, and M/Y ANACONDA S,
British Registry No. 725893, its engines,
equipment, boats, machinery, furnishings,
apparel and appurtenances, etc. in rem,

    Defendants.
_____/

**COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    This matter came before the Court for a non-jury trial on December 27-28, 2006. Plaintiff, Triplecheck, Inc. d/b/a Sea Tow Miami (hereinafter "Triplecheck") brought this admiralty action seeking a salvage award against the Defendant vessel, M/Y Anaconda S, and her owner, Creole Yacht Charters Limited (hereinafter "Creole") for services rendered by Triplecheck on February 19-22, 2005. During and after the trial, the undersigned reviewed the evidence admitted, and considered the applicable law and arguments presented by counsel. The following findings of fact and conclusions of law are therefore made pursuant to the requirements of Rule 52 the Federal Rules of Civil Procedure. Any findings of fact which should be treated as conclusions of law are to be treated as such, and any conclusions of law that should be treated as findings of fact should also be treated as such.

### *I.  FINDINGS OF FACT*

1. On February 19, 2005, the M/Y Anaconda was docked behind a residential home in Miami Beach, Florida. In the early morning on the 19th, the owner of the residential home, Timothy Ivory, and an employee of the vessel's owner, James Bowles, discovered that the boat was taking on water.

2. James Bowles testified that he called Steve Palavs, a former captain of the vessel. Mr. Palavs was at the Miami Beach Convention Center and was able to reach the dock where the boat was tied in approximately 30 minutes. While on the phone with Mr. Bowles, Mr. Palavs suggested calling the U.S. Coast Guard.

3. At some point during this time, Mr. Bowles also called Timothy O'Hare, a Captain who had performed a few odd jobs on the Anaconda. Mr. Bowles called Mr.O'Hare because he lived locally.

4. Mr. Bowles testified that the U.S. Coast Guard was also called, which in turn recommended that Triplecheck be called to assist with the problem. The U.S. Coast Guard advised that it would not render assistance since the boat was not about to sink and no one's life was in danger.

5. Mr. Ivory called Triplecheck sometime between 5:15 a.m. and 5:30 a.m., and Brian Hawthorne, Triplecheck's President, arrived at the scene by boat approximately 7 minutes later.

6. Beforehand, Mr. Palavs arrived at the dock at approximately 5:00 a.m. Mr. Bowles and Mr. Ivory were at the dock when he arrived. He talked briefly with both and boarded the vessel.

7. Mr. Palavs inspected the engine room and found the engines almost completely submerged in water. He was wading in knee deep water in the engine room, which is mid-ship. The vessel's bow was underwater, but the aft was dry. He shut off the

boat's circuit breakers and the seacocks in the engine room.  He began setting up an emergency pump, which he found in the lazarette, when Triplecheck arrived.

8.     Brian Hawthorne, Triplecheck's principal, who has been conducting salvage operations for at least seven years, testified that, when he arrived, the Anaconda's bow was submerged in water and its aft was lifted in the air so that the propellers could be seen.  Mr. Bowles testified, however, that only the front end of the Anaconda was submerged in water and that the propellers of the vessel were not protruding from the water. Mr. Bowles' testimony was corroborated by James Thomas McCrory, a marine surveyor.  Mr. McCrory testified that  the photographs of the vessel he had seen did not indicate that the vessel's stern had been out of the water.  The Court finds Mr. Bowles and Mr. McCrory's testimony more credible on this point.

9.     Mr. McCrory also testified that the water depth at Dilido dock at low tide ranges from 5.8 feet at the east end of the dock to 5.4 feet at the west end of the dock. At high tide, it can be 2 ½ feet more.  He also testified that the draft of the Anaconda is over six feet.  Therefore, at low tide the vessel is grounded and cannot sink any further than it already rests.[1]  Mr. McCrory's examination of the vessel showed that water had accumulated several inches above the forward cabin floor boards, but did not go much above the floor boards.

10.     Mr. Hawthorne initially set up one two-inch gas pump and two electric pumps in the boat.  He testified that the two gas pumps alone are capable of pumping anywhere between 11,000 and 14,000 gallons of water per hour.  According to Mr. McCrory, approximately 23,088 gallons of water entered the vessel.

---

[1] There is no factual dispute here that the vessel took on water and became non-navigable.  The cause of the flooded vessel appears to have been a corroded pipe leading from the sewage holding tank.  TX9 (McCrory Report) at 2.

11. Mr. Hawthorne later called other Triplecheck employees to the scene. Approximately five employees arrived. The undisputed testimony shows that Triplecheck employed two vessels, worth between $125,000 and $200,000 each, including equipment onboard, during the salvage operation.

12. At least one employee dove underwater to inspect the bottom of the boat. The diver also plugged each through hole. A diver performing this kind of work faces the following risks: debris, gear drift, tools floating in water, metal objects, rocks, and anything under the vessel not known to the diver.

13. After about one hour and fifteen minutes of pumping, Triplecheck towed the boat to Jones Boat Yard, which is located close to the airport on the Miami River. Two boats were used to tow the Anaconda from the Venetian Islands past the Miami Herald building, American Airlines Arena, Bayside Marketplace and Inter-Continental Hotel and up the Intercoastal Waterway. Mr. Hawthorne, through radio airways, asked passing vessels to give the Anaconda slow water wakes. It was a holiday weekend and there was heavy traffic on the waterway.

14. Once the boat was docked at the boatyard, a Triplecheck representative gave Tim O'Hare a U.S. Open Form Salvage Agreement for his signature. A Jones Boat Yard representative also handed Mr. O'Hare some papers to sign.

15. Mr. O'Hare signed both Triplecheck's and Jones Boat Yard's paperwork on behalf of the vessel. The Triplecheck Agreement (TX1) provided that the salvager's services would be provided on a "no cure-no pay" basis (compensation upon successful salvage of the vessel).

16. Mr. Bowles testified that he believed he had given Mr. Hawthorne his business card when Mr. Bowles first introduced himself to Mr. Hawthorne and that he said to Mr. Hawthorne, "Obviously, I'm the person you should be speaking to." He also

testified, however, that he never specifically told Mr. Hawthorne that he was not to speak to anybody else with regard to any authorizations that needed to be given. He also never instructed Mr. Hawthorne not to deal with Mr. O'Hare at any particular time.

17.     Additionally, Mr. Bowles testified that, during the entirety of the salvage operation, including the time during which the boat was docked at the boat yard, he never told Mr. Hawthorne or anyone associated with Triplecheck that Mr. O'Hare did not have authority to bind the vessel or its owner. He he never told Mr. O'Hare that he did not have authority to act for the vessel. Mr. O'Hare had the authority to enter into the salvage agreement, just as he had authority to repeatedly sign as captain and representative of the owner the contract for services with Jones Boat Yard.

18.     The vessel remained docked at the boat yard for approximately three days before it was hauled out of the water. Triplecheck employees remained with the vessel during this time, providing periodic pumping. Triplecheck's work on the vessel ceased at that time.

19.     The Court found the testimony of Mr. William Hicks, an expert in salvage operations, as credible. He testified that this salvage operation was of the lowest order and he would consider it a dockside pump out. Mr. Hicks believed Triplecheck's $118,000 demand was an exaggerated amount considering the facts presented. (Triplecheck lowered its demand for a salvage award to $90,000 at the conclusion of the case).

20.     For example, Mr. Hicks testified that, if a boat is in danger of sinking, the first question a salvor asks is the depth of the water. He opined that, if the boat had been in 20-feet deep water, this might have been a high-order salvage operation; however, the Anaconda was already resting on the bottom. In Mr. Hicks's opinion, Triplecheck should be awarded around $15,000, considering the time and effort involved.

21. Mr. Hicks also noted that the Anaconda did not sink, but rather flooded. He explained that sinking connoted some type of catastrophic breach in the hull and a complete submersion of the boat in water. The vessel here was already sitting on the bottom at low tide. She laid to starboard putting a through hole below the waterline that had a faulty line to it and, when the tide came up, the vessel just never refloated. It simply filled up with water the same way a person fills up a bathtub. The vessel had already flooded to the high tide mark, so it was not going to sustain any further damage.

22. The Court finds that the vessel still constitutes salvage. The parties stipulated as such in the Joint Pretrial Stipulation, and the Court finds that the elements of a salvage claim have been established.

23. The amount of salvage due under the parties' Agreement is $30,000, plus prejudgment interest.

## II. CONCLUSIONS OF LAW

The admiralty and maritime law of salvage rewards the voluntary salvor for his successful rescue of life or property imperiled at sea. *E.g., Ocean Servs. Towing & Salvage, Inc. v. Brown,* 810 F. Supp. 1258, 1262 (S.D. Fla. 1993). The Court here must first determine whether this case concerns "salvage" or simply a contractual benefit for which only actual compensation is required, like a dockside pump-out. Normally, to determine that a salvage service was performed, a court must find three elements: (1) marine peril, (2) service voluntarily rendered, not required by duty or contract, and (3) success in whole or in part, with the service rendered having contributed to such success. *See B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 338 (2d Cir. 1983) (finding that the plaintiff had performed a salvage service where the vessel was stranded upon a rocky ledge and was, therefore, in marine peril); *Klein v. Unidentified Wreck & Abandoned Sailing Vessel,* 758 F.2d 1511, 1515 (11th Cir. 1985).

Here, the parties entered into a written "salvage" contract. When there is a contract to undertake a salvage service, there is no "pure salvage." *Id.* at 333. "If there is a contract, then the services were rendered pursuant to the contract, not voluntarily." *Biscayne Towing & Salvage, Inc. v. Kilo Alfa, Ltd.*, No. 02-22644, 2004 WL 3310573, at *6 (S.D. Fla. September 30, 2004) (citing *Flagship Marine Svcs v. Belcher Towing Co.*, 966 F.2d at 602 (11th Cir. 1992)). Although this was thus not a pure salvage, the agreement states: "This SALVAGE AGREEMENT . . . is for salvage services rendered or to be rendered to the Vessel . . . ." Compl., Ex. A. Accordingly, this case involves a salvage operation.

The Court must then determine whether the salvage agreement is enforceable. The Eleventh Circuit has made clear that federal maritime law embraces the principles of agency. *Naviera Neptuno S.A. v. All Int'l Freight Forwarders, Inc.*, 709 F.2d 663 (11th Cir. 1988). Furthermore, the existence of an agency relationship is a question of fact. *Archer v. Trans/American Svcs., Ltd.*, 834 F.2d 1570, 1573 (11th Cir. 1988). In a maritime case, an apparent agency is created when the alleged principal makes some sort of manifestation causing a third party to believe that the alleged agent had authority to act for the benefit of the principal, the belief was reasonable and the claimant reasonably acted on such belief to his detriment. *Warren v. Ajax Navigation Corp.*, 1995 U.S. Dist. LEXIS 19535, 7-8 (S.D. Fla. 1995) (citing *Cactus Pipe & Supply v. M/V Montmartre*, 756 F.2d 1003, 1111 (5th Cir. 1985) ("Apparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him") (citing Restatement (Second) of Agency § 27)). Further, "[t]he principal can create the appearance of authorization through silence." *Moro-Romero v. Prudential-Bache Secur, Inc.*, 1991 U.S. Dist. LEXIS 20169 (S.D. Fla. 1991).

The testimony showed that O'Hare took the initiative in dealing with and assisting Triplecheck representatives. He coordinated the choice of boatyards, instructed Triplecheck where to haul the boat and accompanied Triplecheck to the boatyard. O'Hare signed the salvage agreement, as well as the storage and repair agreement with Jones Boat Yard, and he did so as "captain." Bowles was present at the scene, but he simply stood back and allowed O'Hare to take command of the situation and act on behalf of the Anaconda. As far as Triplecheck is concerned, therefore, O'Hare is the Anaconda's apparent agent. Thus, the Court finds that the salvage agreement is enforceable. *See also Jackson Marine Corp. v. Blue Fox,* 845 F.2d 1307, 1309-10 (5th Cir. 1988) ("It is well established in the general maritime law that the master of a vessel is the agent and representative of the owner and as such can bind the owner by acts performed within the scope of the agency."); *Belcher Oil Co. v. M/V Gardenia,* 766 F.2d 1508, 1512 (11th Cir. 1985) (to defeat a maritime lien claim a court must be satisfied that the contracting party had actual knowledge of the ordering party's lack of authority to bind the vessel).

Next, the Court must determine the proper measure of the salvage award, which under the parties' agreement requires application of the traditional criteria for determining the amount of salvage. (TX1 at 2). When determining the amount of the salvage award, we look to the following elements:

> (1) The labor expended by the salvors in rendering the salvage service;
> (2) the promptitude, skill, and energy displayed in redering the service and saving the property;
> (3) the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed;
> (4) the risk incurred by the salvors in securing the property from the impending peril;
> (5) the value of the property saved; and
> (6) the degree of danger from which the property was rescued.

*The Blackwall*, 77 U.S. 1, 14 (1870); *Atlantis Marine Towing, Inc. v. The M/V Elizabeth*, 346 F.Supp.2d 1266, 1272 (S.D. Fla. 2004) (concluding that plaintiff-salvor is entitled to a

salvage award of $150,000 where it provided services for three hours, arrived promptly at the scene and was exceptionally energetic in fighting the vessel's fire, utilized a $65,000 boat with nearly $100,000 in total value with its equipment to perform its salvage services, two salvors were exposed to the dangers inherent in fighting fires, the parties stipulated that the vessel had a pre-fire value of $2.5 million, and the danger to the vessel was significant).

As the parties' agreement does not provide otherwise, the Court notes that "[t]here is no precise formula utilized by the courts to determine a salvage award. Rather, awards are established on a fact specific basis." *Biscayne Towing & Salvage, Inc. v. Kilo Alfa, Ltd.*, No. 02-22644, 2004 WL 3310573, at *6 (S.D. Fla. September 30, 2004) (citing *New Bedford Rescue Marine Inc. v. Cape Jewelers Inc.*, 240 F.Supp.2d 101, 115 (D. Mass. 2003)).

Triplecheck responded promptly and displayed skill in pumping water out and towing the vessel to Jones Boat Yard. This work was in the nature of a salvage, even though it could also be deemed a dock-side pumpout, because Triplecheck did more than simply pump out the water. Based on this record, Triplecheck pumped out enough water in order to float the vessel and allow it to be towed, *not* on its own power. The vessel's representatives did not, and could not, ask Triplecheck to leave the vessel alone after the pumpout, based upon the continuing danger the vessel was in of re-sinking, and the need to expedite a repair. And, the entire work involved was not just a towing operation because more was involved than simply expediting the voyage of the vessel. *See Taylor v. 42 Foot Egg Harbor Hull*, 1994 WL 779759 at *8 (D.N.J. 1994).

For this service, Triplecheck argues that a minimum $90,000 salvage award is required. The post-casualty value of the vessel, however, is only $600,000. The value of the vessel in comparison with this request is a factor that points in Defendant's favor.

More importantly, the risk incurred by Triplecheck's principal and employees was clearly minimal and the work involved, for a professional salvor, clearly routine. The use of pumps and the towage of the vessel are well within the range of services that entities like Triplecheck may perform that would not be deemed a "salvage." At the time that Triplecheck arrived, the vessel was clearly not navigable, was tilted forward, and had taken on water, though by that point would likely not have totally submerged, as Mr. McCrory testified. The repair work conducted on scene was not extensive. And the danger to the workers, while the boat was docked in a relatively shallow area, was also minimal. These factors thus point to a lesser salvage award, and clearly a much lesser award than Triplecheck argues for in this case. *See, e.g., Biscayne Towing & Salvage v. Kilo Alfa, Ltd.,* 2004 U.S. Dist. LEXIS 27454 (S.D. Fla. 2004) (salvage services that "involved no unusual peril or risk of property, or any special heroism or gallantry" justified a salvage award only slight more than a mere reward) (quoting *The Alamo,* 28 F. 312 (Cir. Ct. 1886)); *see also The Violet Blossom,* 216 F. 379, 380 (D.N.J. 1914) ("The assistance rendered by the Florence did not involve the doing of any of those unusual acts which generally characterize claims founded upon the law of salvage; there was no danger to the Florence and no risk incurred by her. The skill, therefore, was but that ordinarily required in pumping, and no unusual risk was taken. Under the circumstances there ought not to be a large award in the case.").

Triplecheck employed two vessels in the salvage operation. Each is worth $125,000 to $200,000 with the equipment onboard. A total of five Triplecheck employees assisted in the salvage operation, which lasted approximately three days. Triplecheck did not, however, introduce any evidence of actual cost incurred in the performance of its operations.

In light of all these circumstances, the Court concludes that Triplecheck is entitled to a voluntary salvage award of 5% of the Anaconda's post-casualty value. This 5% is based on a 3% recovery rate and an additional 2% uplift due to Triplecheck's status as a professional salvor. *See, e.g., B.V. Bureau Wijsmuller*, 487 F. Supp. at 172-73. The salvage award, therefore, is $30,000. The Court rejects the amount requested by Triplecheck in this case, based upon the evidence cited above. The Court also rejects the amount suggested by Defendant. The Defendant's argument may be more reasonable than Triplecheck's, but ignores the amount of time that Triplecheck incurred in conducting the work for Defendant, at Defendant's request and with Defendant's agents' knowledge and acceptance. A slightly higher salvage award is thus required.

The Court has considered Defendant's argument that the amount of the award should be reduced due to Triplecheck's inflated salvage demand and exaggeration of work performed. Although the Court may agree that not all of Triplecheck's claims are supported by the record, the Court does not find that those claims were made in bad faith, at least based on this record. Accordingly, the Court declines to reduce the salvage award. To the extent Defendant's arguments are still relevant for a determination of attorneys' fees, the Court will leave that issue open for another day, if necessary.

The Court must finally determine whether prejudgment interest should be awarded to Triplecheck. "As a general rule, prejudgment interest should be awarded in admiralty cases. Prejudgment interest is not a penalty, but compensation to the plaintiff for the use of funds that were rightfully his." *Insurance Co. of North America v. M/V Ocean Lynx*, 901 F.2d 934, 942 (11th Cir. 1990). Because there are no "peculiar circumstances" that would counsel against an award of prejudgment interest in this case, *see i.d.*, and because Defendant has not argued against such an award, the Court concludes that Triplecheck is entitled to prejudgment interest from February 19, 2005, through the date

of the Court's Final Judgment on the salvage award of $30,000, which shall be entered at a later date.

By April 20, 2007, the parties shall file supplemental memoranda detailing the appropriate calculations for the award of prejudgment interest. The parties' memoranda are to be filed simultaneously, and no responses will be filed unless requested. If the parties agree about these calculations, they can of course file a joint memorandum setting forth the agreed figures and the bases underlying them.

If either party believes they are entitled to attorneys' fees following entry of these findings of fact and conclusions of law, a petition for such fees in accordance with the Local Rules of the Court shall be filed within thirty days of this date. Any fee amount shall then included to the total amount that shall be set forth in the final judgment.

### III.  CONCLUSION

It is hereby **ORDERED AND ADJUDGED** that Plaintiff Triplecheck is entitled to a salvage award of $30,000 plus prejudgment interest. A final judgment will be issued pursuant to Fed. R. Civ. P. 58 after resolution of the prejudgment interest and attorneys' fees issues.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 25th day of March 2007.

_____
EDWIN G. TORRES
United States Magistrate Judge

Copies provided to:
All counsel of record